**Dale E. McCORMICK and Curtis A. Kastl II, Plaintiffs,**

v.

**CITY OF LAWRENCE, et al., Defendants.**

No. CIV.A.03–2195–GTV.

United States District Court, D. Kansas.

June 24, 2004.

Dale E. McCormick, Lawrence, KS, pro se.

Curtis A. Kastl, II, Lawrence, KS, pro se.

Randall F. Larkin, Gerald L. Cooley, Gilliland & Hayes, P.A., Lawrence, KS, for Defendants.

## MEMORANDUM AND ORDER

VanBEBBER, Senior District Judge.

Plaintiffs Dale E. McCormick and Curtis A. Kastl II, proceeding *pro se,* bring this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiffs allege that Defendants Mik Shanks, Scott Hofer, Kirk Fultz, Dean Brown, Warren Burket, Mike Pattrick, Leo Souders, Justin Stipanovich, and James White—all Lawrence, Kansas police officers—police chief Ron Olin, and the City of Lawrence, violated their First, Fourth, Fifth, and Fourteenth Amendment rights during and after Plaintiffs' arrests in July 2002 and in connection with a sobriety checkpoint in June 2002. Plaintiffs also allege that Defendants violated the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* and Kansas state common law. Defendants have filed a motion to dismiss or for summary judgment (Doc. 121). For the following reasons, the court grants Defendants' motion.

Also pending before the court are Defendants' motion to supplement Doc. 121 by adding a page erroneously omitted (Doc. 140), Plaintiffs' motions for summary judgment (Docs. 18 and 20), and Plaintiff McCormick's motion to deem Plaintiffs' summary judgment motion(s) as uncontested (Doc. 149). The court grants Doc. 140, but denies Plaintiffs' motions as moot.

## I. STANDARDS FOR JUDGMENT

Defendants move to dismiss Plaintiffs' amended complaint pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, or, alternatively, move for summary judgment under Fed.R.Civ.P. 56. Both Plaintiffs and Defendants have asked the court to consider documents outside of the pleadings. When deciding a motion to dismiss, however, the court may consider evidence outside the pleadings only if the court converts the motion to dismiss into a motion for summary judgment. *See Prager v. LaFaver,* 180 F.3d 1185, 1188–89 (10th Cir.1999) (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997)). The court has broad discretion in deciding whether to convert a motion to dismiss into a motion for summary judgment, and will do so here. *See id.* at 1189. The court takes judicial notice of the facts supported by documents on file in the District of Kansas.

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

"[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider the record in the light most favorable to the nonmoving party. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984).

### B. Standards as Applied to Pro Se Plaintiffs

█ Because Plaintiffs are proceeding *pro se*, the court affords them more leniency. *Asselin v. Shawnee Mission Med. Ctr., Inc.*, 894 F.Supp. 1479, 1484 (D.Kan. 1995) (citation omitted). The court may not, however, assume the role of advocate for Plaintiffs simply because they are proceeding *pro se*. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991).

## II. FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to Plaintiffs' case. Immaterial facts and facts not properly supported by the record are omitted.

Between August 18, 2001 and July 13, 2002, Plaintiff McCormick verbally protested and/or recorded police activity in Lawrence, Kansas on approximately fifty occasions. He alleges that at least twenty times, Lawrence police officers have retaliated against his verbal challenges and protests by threatening arrest. Plaintiff McCormick also claims that, in response to his protected speech, he has been physically attacked on three occasions and robbed and kidnapped on two of those three occasions.

### A. July 13, 2002 Incident

On July 13, 2002, at approximately 11:45 p.m., Defendant Hofer initiated a traffic stop of a vehicle driven by Sonia Carbajal for an illegal lane change. Mrs. Carbajal was driving a pick-up truck, licensed in Oklahoma. Her husband was a passenger.

The parties disagree about the sequence of events following the traffic stop. Because the facts must be viewed in the light most favorable to Plaintiffs, many of the following facts are taken from Plaintiff McCormick's testimony at the preliminary injunction hearing held before this court.

Defendant Hofer testified in a state court hearing on Plaintiffs' criminal charges that as soon as he exited his vehicle, he heard Plaintiff McCormick shouting things like, "Hey f* * *er! Leave her the f* * * alone! Leave the out-of-towners alone! Way to welcome them to Lawrence!" Plaintiff McCormick denies uttering the "f-word" at any point prior to being "attacked" by the officers.[1] At that time, Plaintiffs were located in a McDonald's parking lot approximately 30–40 feet away from the stop, and Plaintiff McCormick was holding a video camera.

Defendant Hofer tried to take down Mrs. Carbajal's information, but she was

---

1. The court notes that the citation to the record provided by Plaintiffs here and elsewhere, Document 129, provides no support for Plaintiffs' assertions. The court spent a considerable amount of time reviewing the record, and determined that Plaintiffs likely intended to cite Document 120 instead of Document 129. *But cf. Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024–25 (10th Cir. 1992) (stating that the court will "not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury"). Because the contents of Document 120 support Plaintiffs' assertions, the court will not deem Defendants' version of the facts uncontroverted.

not carrying a driver's license or any other identification at the time. Defendant Hofer testified in the state court hearing that he did not have a clear view of the passenger in the vehicle, and that he was distracted by Plaintiff McCormick's shouting. Plaintiffs deny that Defendant Hofer was distracted by the shouting and that Defendant Hofer was legitimately concerned for his safety, citing Defendant Hofer's testimony in the state court hearing that he "ignored them and approached the vehicle . . . and continued with the car stop." Because Defendant Hofer successfully ignored them, Plaintiffs reason, he must not have been distracted by their shouting.

Defendant Shanks arrived as Defendant Hofer was talking to Mrs. Carbajal. Defendant Shanks recognized Plaintiff McCormick, and was concerned about his presence. Plaintiff McCormick denies that any concern was warranted based on his non-threatening behavior and his past history of protesting.

Upon Defendant Shanks's arrival, Plaintiff McCormick continued shouting, redirecting some of his comments toward Defendant Shanks. At that time, Defendant Shanks claims that Plaintiff McCormick was screaming things like "Mother F* * *ers," "F* * * heads," "F* * *ing pigs," "Why don't you run around the track, chubby?," "Hey chubby, what's your name?," "Hey fatty," "Hey fat a* *," and "Leave her the f* * * alone." Again, Plaintiff McCormick denies using the "f-word" until later.

Plaintiff McCormick's verbal tirade caused "extreme alarm" in the officers. While Defendant Hofer checked Mrs. Carbajal's information through dispatch, Defendant Shanks returned to his vehicle and trained two spotlights on Plaintiffs' position. Plaintiffs submit that the only purpose for the spotlight was to thwart their filming, as the area was well-lit and Defendant Shanks testified in the state court

jury trial that he knew that he was blinding Plaintiff McCormick's video camera when he turned the spotlights on.

Plaintiffs then walked around a fence and approached the traffic stop, coming within ten to fifteen feet of the stopped vehicle. Defendant Shanks warned Plaintiffs that he would arrest them if they interfered with the traffic stop. Plaintiff McCormick asked, "Is that a threat?" Defendant Shanks has testified that he felt physically threatened by Plaintiffs, but Plaintiffs deny that any such feeling was justified. Plaintiff McCormick had never physically harmed anyone during his protests, Plaintiffs did not make an attempt to physically interfere with Defendants Shanks or Hofer, they were not making threats, and the "verbal banter" remained consistent.

Plaintiff McCormick claims that Defendant Shanks turned toward him and rhetorically asked, "Are you interfering with my investigation?" Defendant Shanks then said to himself, "I think you are," and told Plaintiff McCormick that he was under arrest. According to Plaintiff McCormick, Defendant Shanks then began rushing at him, and a struggle ensued. Plaintiff McCormick testified in the preliminary injunction hearing that Defendant Shanks tried to "tackle" him, but that he stood in a solid stance and refused to let himself be tackled. Defendant Shanks then did a leg sweep on Plaintiff McCormick and pinned him to the ground to place handcuffs on him, causing what Plaintiff McCormick terms "excruciating pain." Before Defendant Shanks placed Plaintiff McCormick in the patrol car, he thrust down on the handcuffs, which were on "excruciatingly tight," again causing Plaintiff McCormick "immense and excruciating pain." Plaintiff McCormick claims that he had a numb feeling in his hand for eight or nine days.

Defendant Hofer decided not to issue a citation to Mrs. Carbajal. As Defendant Hofer was informing Mrs. Carbajal that she was free to go, he saw the altercation and observed Plaintiff McCormick hand the video camera to Plaintiff Kastl, who continued trying to film the incident. With the help of Mr. Carbajal, Defendant Hofer was able to place Plaintiff Kastl in handcuffs. During that altercation, Plaintiff Kastl kept repeating, "I got you now, f* * *er" and "You're screwed, I got you now."

Defendants placed Plaintiffs under arrest, citing a state statute prohibiting obstruction of legal duty and a local ordinance prohibiting interference with the duties of a police officer.

### B. June 28, 2002 Incident

Because Plaintiff McCormick has entered a videotape of the June 28, 2002 incident into the record, the events of that day are largely uncontroverted.

On June 28, 2002, Plaintiff McCormick began protesting a sobriety checkpoint supervised by Defendant Kirk Fultz. Plaintiff McCormick was running his video camera, and began yelling at the officers. Among other things, he yelled at Defendant Shanks, "Hey, what's your name there buddy? Chubby? Chubby?" As Plaintiff McCormick continued his activities, Defendant Fultz approached him and told him, "You need to make sure you don't bother any of my officers. Do you understand?" Plaintiff McCormick responded, "This is Kirk Fultz. This is the officer that repeatedly assaulted, battered, and threatened to arrest me on [August 18, 2001]. Isn't that correct officer?" After Defendant Fultz repeated his warning, Plaintiff McCormick responded, "F* * * you! How's that? That's protected expression. First Amendment. I can quote a case to you if you'd like." Defendant

Fultz then left the sidewalk and returned to the sobriety checkpoint.

As he continued videotaping and heckling the officers, Plaintiff McCormick asked, "Did Sarge threaten to arrest me, trooper?" After eliciting no response, Plaintiff McCormick said, "I'd have to sue him again if he did." He then yelled, "Leave them alone, Sarge! Sarge, leave them alone!" Later, Plaintiff McCormick said, "Hey, Sarge, aren't you going to batter me this time? Aren't you going to threaten me? I was really counting on that."

After a short time, Plaintiff McCormick began moving toward a sobriety test that was being conducted further down the sidewalk. Defendant Fultz and Plaintiff engaged in the following conversation:

**Fultz:** Don't come any closer than right there.

**McCormick:** Oh. Isn't this a public sidewalk?

**Fultz:** That's an investigation. Don't get any closer than right there.

**McCormick:** Well, actually, Sarge, uhhhh, eight feet. I was just reading a case tonight. Eight feet is the limit. I can get up to eight feet away from an officer and a suspect. If you'd like, I could go home and get the case for you and show it to you. [Defendant Fultz then placed himself between the sobriety test and Plaintiff McCormick.]

**Fultz:** Don't walk past me.

**McCormick:** Don't walk past you?

**Fultz:** Don't get any closer than right there [pointing to line on sidewalk].

**McCormick:** Are you going to arrest me if I do?

**Fultz:** Yes.

**McCormick:** Can I say anything to them?

**Fultz:** No.

**McCormick:** I can't say anything to them?

**Fultz:** No. They're doing an investigation.

**McCormick:** Are you going to arrest me if I say something to them?

**Fultz:** If you impede the investigation.

**McCormick:** No, if I say something to them, are you going to arrest me?

**Fultz:** You heard what I said.

**McCormick:** Well, I just want to know. I want to say something to them and I want to know if I can or not, officially?

**Fultz:** No, you can't say anything to them.

**McCormick:** I can't say anything to them, and that's the official position of the Lawrence Police Department, right here, right now? Correct?

**Fultz:** You heard what I said.

**McCormick:** Okay ... the jury heard what you said, too, Sarge. They did, real well. Want to say it again for the jury? Tell the jury ... how funny it is to violate people's First Amendment rights, Sarge.

. . . . .

Aren't you, aren't you going to come beat me up and bump into me and threaten me and all that kind of stuff again; yell and scream in my face. You want to do that again? You're not angry enough to do that this time? Or, did someone tell you that you can't do that anymore? Is that what it is Sarge? Someone told your dumb a* * that you can't do that anymore? I'll assume that's what it is.

Plaintiff McCormick then tried to report Defendant Fultz to a state trooper, but the trooper declined to take the report. Eventually, Plaintiff McCormick threatened to sue the trooper and tried to report him to Defendant Fultz.

Plaintiff repeatedly yelled, "Kenny" at Officer Ken Farrar, and named another officer "Tippy Turtle" and serenaded him. Plaintiff McCormick repeatedly yelled, "F* * * the police! F* * * the police!" He also called the officers "oppressive, sick a* *holes," "jack-booted thugs," "Gestapo," "pieces of sh*t," "sick, oppressive a* *holes," and "sick a* *holes," among other epithets. At one point, Plaintiff McCormick yelled, "Perjurious, amoral, unethical Ken Farrar!" He then told Defendant Fultz, "Sarge ... I'll be adding you to my lawsuit next week, you sick a* *hole!"

As the officers closed down their checkpoint, Plaintiff McCormick and a bystander had the following conversation:

**Bystander:** Why are they leaving before the bars close?

**McCormick:** Uhhhh ... I don't know. Sometimes I ... manage to drive them off. Last time they had a checkpoint, man, they like packed up and left like two hours early, because it was really ... because I was out there making a big scene [laughing].

. . . . .

It's what I do for a living, man.

. . . . .

It's like I got fed up with the police. So, I decided to start taking some power back.

Plaintiff McCormick continued cursing the officers as they wrapped up the checkpoint and left.

## III. DISCUSSION

### A. Qualified Immunity

Defendants argue that qualified immunity protects them from Plaintiffs' suit. Qualified immunity shields an individual government official performing discretionary functions from liability for civil damages insofar as his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Butler v. City of Prairie Village*, 172 F.3d 736, 745 (10th Cir.1999). To determine whether a government official is entitled to qualified immunity, the court first must decide whether the plaintiff has " 'asserted a violation of a constitutional right at all.' " *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir.1995) (quoting *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). If the plaintiff has made a valid claim, then the court must evaluate whether the asserted right was clearly established such that a reasonable person in the official's position would have known that his or her conduct violated that right. *Id.*; *Merkel v. Leavenworth County Emergency Med. Servs.*, No. 98–2335–JWL, 2000 WL 127266, at *10 (D.Kan. Jan.4, 2000). A constitutional right is clearly established when there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

### 1. Claims Arising Out of the July 13, 2002 Incident

#### a. Retaliation—Count I

In Count I, Plaintiffs allege that Defendants Shanks and Hofer retaliated against them for exercising their First Amendment rights. Defendants contend that Plaintiffs were not exercising their First Amendment rights, and were instead using unprotected "fighting words." The court agrees.

■■ "[T]he First Amendment bars retaliation for protected speech." *Crawford–El v. Britton*, 523 U.S. 574, 592, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). "[A]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (citation and internal quotation marks omitted). When the alleged infringer is not the plaintiff's employer or a party to a contract with the plaintiff, the court looks to the following factors:

(1) that the plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."

*Id.* at 1212 (citation omitted).

■■ Defendants argue that Plaintiffs cannot satisfy the first *Worrell* element because Plaintiffs used "fighting words," which are not protected by the First Amendment. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). "Fighting words" are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke a violent reaction." *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Police officers may be the victim of fighting words:

Police officers, notwithstanding their devotion to duty and the excellence of their training, are human beings and subject to the same failings as butchers, bakers, and candlestick makers. We do not see

the logic in finding that police officers can be expected to remain stoic in the face of vitriolic comments that one would expect to elicit violence from someone else. *Pringle v. Court of Common Pleas,* 604 F.Supp. 623, 626 (M.D.Pa.1985) (rev'd on other grounds). But the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).

The *Pringle* court held that "if calling someone a 'goddamn f* * *ing pig' does not exemplify 'fighting words,' [it was] hard pressed to imagine what words could be so construed." 604 F.Supp. at 626; *see also Woodward v. Gray,* 241 Ga.App. 847, 527 S.E.2d 595, 599–600 (2000) (listing as examples of fighting words: "son of a b*tch," "motherf* * *er," "bastard," "b*tch," "motherf* * *ing pig," and "pig") (citation omitted); *Commonwealth v. Mas-trangelo,* 489 Pa. 254, 414 A.2d 54, 55–56, 58 (1980) (holding that "f* * *ing pig" and other epithets were fighting words); *City of Springdale v. Hubbard,* 52 Ohio App.2d 255, 369 N.E.2d 808, 810–12 (1977) (finding "f* * *ing pigs" to be fighting words). *But see United States v. Poocha,* 259 F.3d 1077, 1082 (9th Cir.2001) (holding that clenching fists, sticking out chest, and yelling "f* * * you" to officer was not fighting words); *Buffkins v. City of Omaha,* 922 F.2d 465, 472 (8th Cir.1990) (holding that calling a police officer an a* *hole was protected speech); *L.A.T. v. Florida,* 650 So.2d 214, 215–18 (Fla.Dist.Ct.App.1995) (holding that words such as "You f* * *ing cops, what the h*ll do you think you're doing? You are full of bull sh*t" were not fighting words, and compiling fighting words cases); *State v. John W.,* 418 A.2d 1097, 1103, 1108 (Me.1980) (holding that "Hey, you f* * *ing pig, you f* * *ing kangaroo" did not constitute fighting words").

■ After reviewing the record in the case and carefully considering the context of Plaintiffs' speech, the court determines that Plaintiffs engaged in "fighting words," rather than protected speech. Although the facts regarding the proximity of Plaintiffs to Defendants and the volume of Plaintiffs' remarks are controverted, the court concludes as a matter of law that Plaintiffs' speech was "inherently likely to produce a violent reaction." *Cohen,* 403 U.S. at 20, 91 S.Ct. 1780. Plaintiffs were not only showing their disapproval of police activity, but also making repeated personal attacks on the officers. " 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' " *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766 (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

Under the uncontroverted facts of this case, viewed in the light most favorable to Plaintiffs, the court concludes that no reasonable jury could find that Plaintiffs engaged in protected speech. Plaintiffs are unable to meet the first requirement of the *Worrell* test, and the court grants summary judgment and qualified immunity on this claim.

Even if the court were to proceed to the second prong of the qualified immunity analysis, the court would determine that it is not clearly established that Plaintiffs were engaging in protected speech. The diverse range of case law cited earlier in this Memorandum and Order shows that the law on what constitutes "fighting words" is not clearly established. "[A] civil rights defendant is 'entitled to a "fair warning" that his conduct deprived his victim of a constitutional right.' " *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1247

(10th Cir.2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739–40, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). For this reason, too, Defendants are entitled to summary judgment and qualified immunity.

### b. Prior Restraint—Count II

■ In Count II, Plaintiffs allege that the actions Defendants Shanks and Hofer took against them on July 13, 2002, constituted a "prior restraint" in violation of the First Amendment. Defendants counter that Count II fails for the same reason Count I fails; Plaintiffs did not engage in protected speech. The court agrees. Furthermore, it is not clearly established that Defendants' actions constituted a prior restraint on Plaintiffs' activities. Although it appears that an arrest may constitute a "prior restraint" in some circumstances, *see SOB, Inc. v. County of Benton*, 317 F.3d 856, 866 (8th Cir.2003); *United States v. Moore*, 215 F.3d 681, 685 (7th Cir.2000); *McCormick v. City of Lawrence*, 253 F.Supp.2d 1172, 1198 (D.Kan.2003), the law is not clearly established.[2] As Plaintiffs state in their summary judgment memorandum, incorporated by reference, " 'Prior restraint' jurisprudence in this [c]ountry predominantly involves 'prior restraints' on print and electronic media or on licensing and permitting of parades and demonstrations. Thus, [P]laintiffs' 'free speech/prior restraint' claim is somewhat unusual." That the doctrine of prior restraint would apply to Defendants' actions is not clearly established such that a reasonable officer would know it prohibited such actions, and the court grants qualified immunity on this claim.

### c. Content Discrimination—Count III

■ Plaintiffs bring a "content discrimination" claim in Count III, alleging that Defendants impermissibly discriminated against them based on their viewpoints and/or the content of their speech. Again, Defendants argue that Plaintiffs did not engage in protected speech. The absence of protected speech is fatal to Plaintiffs' claim.

Moreover, the court is skeptical whether Plaintiffs have sufficiently alleged a clearly established constitutional violation for "content discrimination"—normally, content or viewpoint discrimination cases arise in the context of an ordinance, statute, or regulation limiting speech. Plaintiffs have not cited any law showing that content discrimination principles would apply in this particular situation, and the court has not found any. *See Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1228 (10th Cir.2001) (citing *Tonkovich*, 159 F.3d at 530 (holding that qualified immunity was proper when the plaintiff failed to cite any case law showing that the law was clearly established)). The qualified immunity inquiry must be considered "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. The court grants qualified immunity as to this claim.

---

**2.** The court acknowledges that Defendants did not specifically argue that they are entitled to qualified immunity with respect to Count II or Count III. However, they have raised the defense of qualified immunity generally in their briefs, and the court concludes that the defense should be considered with respect to all of Plaintiffs' § 1983 claims. *See Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir.1998) (holding that the defendants' motions to dismiss on the basis of qualified immunity were sufficient to put the court on notice that the defense was being asserted with respect to the entire due process claim); *Keys Youth Servs., Inc. v. City of Olathe*, 38 F.Supp.2d 914, 925–26 (D.Kan. 1999) (considering qualified immunity with respect to entire case, although the defendants' motion to dismiss did not address the equal protection, due process, or taking claims).

### d. Seizure of Persons—Count IV

In Count IV, Plaintiffs claim that Defendants Shanks and Hofer seized them in violation of the Fourth Amendment by arresting them without probable cause. Defendants respond that they had probable cause to detain Plaintiffs, invalidating Count IV. Alternatively, Defendants argue that a reasonable officer would have believed he had probable cause, entitling them to qualified immunity.

■ "Unconstitutional arrests are unreasonable seizures of the person that violate the Fourth and Fourteenth Amendments." *Rose v. Mitchell,* 443 U.S. 545, 577, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). Whether the arrest, as a warrantless arrest, amounts to an unreasonable seizure, and thus a constitutional violation, turns on whether there was probable cause to believe that the plaintiff had committed a crime. *Thompson v. City of Lawrence,* 58 F.3d 1511, 1515 (10th Cir.1995). "Under a § 1983 claim of unlawful arrest, [d]efendant police officers lose their shield of qualified immunity only if they could not have believed that [the plaintiff's] arrest was based on probable cause." *Id.* (citation omitted). The critical inquiry is not whether the plaintiff actually committed the crime at issue, but whether the police had probable cause to believe that he did.

■ Defendants contend that they had probable cause to believe Plaintiffs were violating K.S.A. § 21–3808(a) and City of Lawrence ordinance § 14–502 at the time of their arrest. K.S.A. § 21–3808(a) makes it illegal to obstruct legal process or official duty:

(a) Obstructing legal process or official duty is knowingly and intentionally obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty.

The municipal ordinance has similar language: "If any person shall knowingly or willfully obstruct, resist or oppose any police officer or any other ministerial officer while such officer is engaged in the discharge of his or her duty, such person shall, upon conviction, be guilty of a misdemeanor." City of Lawrence, Kansas Municipal Ordinance § 14–502.

In Case No. 02–2135–JWL, Judge Lungstrum analyzed what conduct might violate K.S.A. § 21–3808(a). *McCormick,* 253 F.Supp.2d at 1195–96. Judge Lungstrum examined *State v. Parker,* 236 Kan. 353, 690 P.2d 1353 (1984), a Kansas Supreme Court case that held that the use of force was not necessary to violate K.S.A. § 21–3808(a). *Id.* at 1195 (quoting 690 P.2d at 1359). He also noted that the Kansas Court of Appeals has explicitly stated that the statute applies to oral arguments. *Id.* (citing *State v. Latimer,* 9 Kan.App.2d 728, 687 P.2d 648, 653 (1984)). He concluded that under Kansas law, "obstruction of legal process or official duty requires conduct that 'must have substantially hindered or increased the burden of the officer in carrying out his official duty.' " *Id.* (quoting *Parker,* 690 P.2d at 1362).

In the instant case, the court concludes that Defendants had probable cause to believe that Plaintiffs violated K.S.A. § 21–3808(a). As Justice Powell said in his concurrence in *Houston v. Hill:*

A "challenge" [directed at police officers] often takes the form of opposition or interruption of performance of duty. In many situations, speech of this type directed at police officers will be functionally indistinguishable from conduct that the First Amendment clearly does not protect. For example, I have no doubt that a municipality may punish an individual who chooses to stand near a police officer and persistently attempt to

engage the officer in conversation while the officer is directing traffic at a busy intersection. Similarly, an individual, by contentious and abusive speech, could interrupt an officer's investigation of possible criminal conduct.

482 U.S. at 479, 107 S.Ct. 2502 (Powell, J., concurring in judgment). Plaintiffs were yelling "fighting words" at Defendants while they were trying to conduct a traffic stop at night. Plaintiffs were also approaching the traffic stop. The driver of the car did not have proper identification on her person, and Defendant Hofer could not see the passenger. The circumstances support a determination that, as a matter of law, Plaintiffs' behavior " 'substantially hindered or increased the burden of the officer in carrying out his official duty.' " *McCormick*, 253 F.Supp.2d at 1195 (quoting *Parker*, 690 P.2d at 1362).

In an attempt to create a genuine issue of fact as to whether Defendant Hofer was distracted by their conduct, Plaintiffs cite Defendant Hofer's testimony in the state court hearing that he "ignored them and approached the vehicle . . . and continued with the car stop." The court disagrees that this comment creates a fact issue over whether Plaintiffs' behavior was distracting.

Plaintiffs have raised an argument that Defendants could not have had probable cause to arrest them under K.S.A. § 21–3808 because the statute only applies during the commission of a misdemeanor or felony, and Defendants were investigating a traffic infraction at the time of the incident. *See State v. Hagen*, 242 Kan. 707, 750 P.2d 403, 404–05 (1988). The court has considered Plaintiffs' argument, but determines that even if Plaintiffs are correct, the law is not clearly established such that a reasonable officer would have known that he lacked authority under § 21–3808. *See State v. Hudson*, 261 Kan. 535, 931 P.2d 679, 680 (1997) (holding that

"since the officer attempted to stop the defendant for a traffic violation, the obstruction of official duty was a misdemeanor"). In any event, Defendants had probable cause to arrest Plaintiffs under the Lawrence ordinance.

Because the court determines that Defendants' arrest of Plaintiffs was supported by probable cause, no constitutional violation may lie, and Defendants are entitled to qualified immunity and summary judgment.

#### e. Excessive Force—Count V

Count V is an excessive force claim by Plaintiff McCormick against Defendants Shanks and Hofer. Plaintiff McCormick claims that Defendant Shanks used excessive force on him to effect the arrest, and Defendant Hofer failed to intervene. Defendants argue that they are entitled to qualified immunity because physical touching is necessary in any arrest, and under the uncontroverted facts of the case, their actions were reasonable.

 Claims of excessive force during arrest are analyzed under the Fourth Amendment "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The court must evaluate whether an officer's actions were reasonable in light of the facts and circumstances of the case. *Id.* at 397, 109 S.Ct. 1865. At least three criteria are relevant to this inquiry: (1) the severity of the crime; (2) whether the arrestee poses an immediate threat; and (3) whether the arrestee is actively resisting arrest or trying to flee. *Id.* at 396, 109 S.Ct. 1865. " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* at 397, 109 S.Ct. 1865 (internal citation omitted).

■ Plaintiff McCormick's claims that the handcuffs were too tight and that Officer Shanks thrust down on them unnecessarily are insufficient to show that Defendant Shanks used excessive force. *See Thompson*, 58 F.3d at 1516; *Swanson v. Fields*, No. 93–3083, 1993 WL 537708, at *6 (10th Cir. Dec.20, 1993); *Hannula v. City of Lakewood*, 907 F.2d 129, 132 (10th Cir.1990). Although Plaintiff McCormick claims to have photographs of bruises on his wrists, such photographs are not before the court. Furthermore, Plaintiff McCormick admits that he did not immediately succumb to Defendant Shanks's attempt to restrain him; he stood in a solid stance and refused to let himself be tackled. One of the considerations in evaluating the objective reasonableness of force is whether the arrestee is resisting arrest. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. The court concludes that Defendant Shanks's use of force was reasonable and commensurate with the resistance offered by Plaintiff McCormick.

■ Because the court has determined that no constitutional violation occurred, there is no need to proceed to the second prong of the qualified immunity analysis. Even if the court were to proceed to the "clearly established" inquiry, the court would conclude that a reasonable officer would not have known that the amount of force used in this instance was excessive. "Qualified immunity operates … to protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S.Ct. 2151 (internal citation omitted). Defendants were faced with a hostile arrestee armed with a video camera, who stood rigidly as they tried to arrest him. The court concludes that Defendants are entitled to summary judgment and qualified immunity on this claim.

### f. Seizure of Recording Devices—Count VI

■ Count VI claims that Defendants Shanks and Hofer seized Plaintiffs' audio and video recording devices without probable cause to believe that they were contraband or evidence of a crime. A law enforcement officer may lawfully seize an item if he has probable cause to believe that the item is either (1) evidence of a crime, or (2) an instrumentality or object of a crime. *United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The recording devices purportedly contained evidence of a crime; Plaintiffs appeared to be recording the events while they were protesting the traffic stop. The earlier rulings of this court therefore compel a grant of summary judgment on this issue.

### g. Search of Persons—Count VII

■ In Count VII, Plaintiffs allege that Defendants Shanks and Hofer unreasonably searched their persons in connection with their arrest. A law enforcement officer may search a person in connection with a lawful arrest. *New York v. Belton*, 453 U.S. 454, 457, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Because the court has held that Plaintiffs' arrest was lawful, it grants summary judgment as to this claim.

### h. Search of recording equipment— Counts VIII–XI

The court has already dismissed counts VIII–XI. Although Plaintiffs have included them in their amended complaint, the court will not reconsider the validity of the claims.

### i. Destruction of Recordings— Count XVIII

In Count XVIII, Plaintiffs allege that Defendants Shanks and Hofer "erase[d],

destroy[ed], or [stole] [P]laintiffs' audio and video recordings," thereby constituting a prior restraint and violating Plaintiffs' First Amendment rights. The evidence pertaining to this claim presents a classic factual dispute. Defendants Shanks and Hofer have submitted affidavits denying that they erased, destroyed, or stole the audio and video recordings. Plaintiffs have testified that they verified the equipment was working before the incident and properly started the equipment, such that it should have recorded the incident.

Whether Defendants' alleged actions violated Plaintiffs' right to be free from a prior restraint on expression is tenuous. But Plaintiffs have presented evidence that they planned to produce and sell a documentary including the recordings of July 13, 2002. If Defendants erased Plaintiffs' recordings, then they may have effectively prevented Plaintiffs from expressing themselves through the documentary. In other words, a trier of fact could find that Defendants preemptively denied Plaintiffs the right to engage in protected expression. *See Ward,* 491 U.S. at 795 n. 5, 109 S.Ct. 2746 (citation omitted).

▆▆▆ Even if Plaintiffs have alleged a constitutional violation, however, the court determines that it is not clearly established that destruction of recordings constitutes violation of the First Amendment. Plaintiffs have cited no law in support of their claim, and the court has not found a case holding that destruction of a video or audio recording by the police constitutes a prior restraint. *See Camfield,* 248 F.3d at 1228 (citing *Tonkovich,* 159 F.3d at 530 (holding that qualified immunity was proper when the plaintiff failed to cite any case law showing that the law was clearly es-

tablished)). The court grants qualified immunity as to this claim.

### j. Probable Cause Affidavits— Counts XIII and XIV[3]

In Counts XIII and XIV, Plaintiffs allege in part that Defendant Shanks swore two probable cause affidavits, knowing that they did not support probable cause, thereby causing Plaintiffs to be unreasonably seized through the resulting involvement in court proceedings. Count XIII alleges a Fourth Amendment violation. Count XIV alleges in part that the affidavits were in retaliation for Plaintiffs' exercise of their First Amendment rights. Defendant Shanks contends that the existence of probable cause is fatal to any unlawful seizure claim. *See Elbrader v. Blevins,* 757 F.Supp. 1174, 1179 (D.Kan. 1991). The court agrees, and grants summary judgment as to these claims.

### k. Search of Recording Equipment in Violation of State Law— Counts XX–XXIII

Counts XX–XXIII allege that Defendants Shanks, Hofer, Burket, Stipanovich, Brown, and Pattrick searched Plaintiffs' recording equipment in violation of their right to privacy under Kansas common law. As a result of this Memorandum and Order, the court grants summary judgment as to all of Plaintiffs' federal claims. Having dismissed all of Plaintiffs' claims over which the court has original jurisdiction, the court declines to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (1994); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

---

**3.** The court notes that Plaintiffs' amended complaint still names former Defendant Mark Knight, whom the court has already dis-

missed from the case. The court will not reconsider the claims against Mark Knight.

## B. Claim Arising Out of the June 28, 2002 Incident—Count XII

Count XII is a First Amendment retaliation claim against Defendant Fultz for his threat to arrest Plaintiff McCormick on June 28, 2002. Defendant Fultz argues that Plaintiff used "fighting words," and did not engage in conduct protected by the First Amendment.

The court has viewed the video of June 28, 2002 multiple times, and concludes that under the circumstances of this case, Plaintiff McCormick engaged in fighting words. Plaintiff McCormick repeatedly uttered personal and abusive epithets that were "inherently likely to produce a violent reaction." *Cohen*, 403 U.S. at 20, 91 S.Ct. 1780. Such expression is not protected under the First Amendment.

In addition, the court questions whether Defendant Fultz took any action that "caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in [the protected] activity,'" the second requirement of the *Worrell* test. 219 F.3d at 1212. Defendant Fultz told Plaintiff McCormick that he would be arrested if he interfered with the officers' investigation. Only after repeated questioning and manipulation of words by Plaintiff McCormick did Defendant Fultz tell him that he could not talk to the officers. Moreover, Plaintiff McCormick continued yelling at the officers after Defendant Fultz told him that he would be arrested if he interfered with their investigation.

For these reasons, the court concludes that Plaintiff McCormick has failed to show that Defendant Fultz violated his constitutional rights on June 28, 2002. The court need not proceed to the second prong of the qualified immunity inquiry, but if it did, the result would be the same as that of the July 13, 2002 retaliation claim.

## C. RICO Claim—Count XIX

In Count XIX, Plaintiffs allege that Defendants Shanks, Hofer, Fultz, White, and Souders have harmed them in violation of RICO, through their pattern of racketeering activities. Defendants claim that Count XIX fails because Plaintiffs have not alleged "predicate acts" or injury to their "proprietary rights" under RICO, and because Plaintiff McCormick has already sued Defendants White and Souders for the events of January 10, 2002 in Case No. 02–2135–JWL. Defendants claim that the court denied Plaintiff McCormick's attempt to add a RICO claim in Judge Lungstrum's case, serving as res judicata on the issue. Defendants add that allowing the claim in the instant case would violate the "one-action" rule.

### 1. Res Judicata

The court first addresses the claims against Defendants White and Souders. The touchstone issue with respect to Defendants White and Souders is whether there was a final judgment on the merits in Case No. 02–2135–JWL. *Yapp v. Excel Corp.*, 186 F.3d 1222, 1226 (10th Cir.1999) (citing *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir.1997)). If so, then the doctrine of res judicata may prevent Plaintiffs from raising their claim against Defendants White and Souders here.

In Case No. 02–2135–JWL, Judge Lungstrum denied Plaintiff McCormick leave to amend his complaint to add a RICO claim against Defendants White and Souders because the claim was untimely. Judge Lungstrum did not dismiss the claim, as it was never filed. Judge Lungstrum did not address the futility of the claim; he decided the motion based on untimeliness. The court concludes that Judge Lungstrum did not issue a final judgment on the merits.

### 2. "One–Action" Rule

The "one-action" rule also does not prohibit consideration of Plaintiffs' claim against Defendants White and Souders. The Kansas one-action rule is a judicially-developed concept that has been articulated through case law interpreting the Kansas comparative negligence statute, K.S.A. § 60–258a. The rule requires that all negligence claims arising out of one occurrence be determined in one action. *Mick v. Mani,* 244 Kan. 81, 766 P.2d 147 (1988). The impetus for the one-action rule was to ensure that all parties against whom a claim of comparative negligence could be made were joined in the same action so that one judicial determination of comparative fault could be rendered. *Eurich v. Alkire,* 224 Kan. 236, 579 P.2d 1207, 1209 (1978). The rule is essentially aimed at prohibiting a plaintiff from bringing a second action against a party that could have been, but was not, named in the first action. *Id.*

In this case, Defendants essentially attempt to invoke the one-action rule as a form of res judicata. But the one-action rule is not intended to be an extension of res judicata, *Mick,* 766 P.2d at 158, and this case does not involve claims of negligence or comparative fault. The court concludes that the one-action rule is not applicable to this case, and that Defendants White and Souders are not entitled to summary judgment on this ground.

### 3. Merits of RICO Claim

The court now turns to the merits of Plaintiffs' RICO claim. Defendants claim that Plaintiffs have alleged neither "predicate acts" nor injury to proprietary rights, as required by RICO. The court agrees.

Under RICO, a plaintiff must plead at least two "predicate acts" listed in 18 U.S.C. § 1961(1) to properly allege a "pattern of racketeering." *Raymark Indus., Inc. v. Stemple,* 714 F.Supp. 460, 469 (D.Kan.1988). The acts must be related and must "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. N.W. Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* at 242, 109 S.Ct. 2893.

The court finds several flaws with Plaintiffs' RICO claim. First, the court is reluctant to term any of Defendants' activities as "kidnapping," "robbery," or "extortion," as Plaintiffs suggest. In any event, there has been no pattern of racketeering. While a "pattern" requires at least two acts, it does not "mean" two acts. *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). "The implication is that while two acts are necessary, they may not be sufficient." *Id.* "One of the prime considerations in finding a pattern is whether the predicate acts are both related and sufficiently differentiated. If the acts are too similar, then no ongoing design or continuity can be found." *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,* 646 F.Supp. 118, 120 (D.Del.1986) (citation omitted). " '[T]he repetition of an act taken against a single victim or set of victims following closely on the heels of the original wrong, in some circumscribed circumstances ... suggests no expansion, no ongoing design, no continuity, such as was the target of Congress in RICO.' " *Id.* (citation omitted).

Plaintiffs have alleged that they were kidnapped and robbed on two occasions. They also allege that Defendants committed "extortion" by threatening to arrest them unless they ceased their First Amendment activities on several occasions. The court determines that Plaintiffs' alle-

gations are insufficient to constitute a pattern of racketeering activity. Defendants' alleged acts are against a single victim or set of victims. The acts are similar, if not identical, and they were only taken over the course of less than a year. The court concludes that the alleged acts do not meet the "pattern" requirement of RICO.

 The court also rejects the argument that Plaintiffs have sufficiently alleged proprietary losses. RICO only provides damages for injury to business or property. *Sedima*, 473 U.S. at 496, 105 S.Ct. 3275. Although Plaintiffs claim that their First Amendment rights are "property" within the meaning of RICO, the court disagrees. "The alleged deprivation of First Amendment rights alone does not constitute the kind of injury required to invoke RICO's civil remedies." *Newman v. Associated Press, Inc.*, No. 96–7176, 1996 WL 591307, *2 (2d Cir. Oct.15, 1996) (citation omitted). Even if freedom of speech constituted "property," the court has held that Plaintiffs were not stripped of their First Amendment rights.

Plaintiffs also allege that Defendants interfered with their business of filming, producing, and selling documentary videos. Plaintiffs' position is almost laughable. To the contrary, Defendants' alleged activities actually provide Plaintiffs with a source of material for their business. Without police reaction to Plaintiffs' activities, Plaintiffs would have little to film and produce. It is possible that the alleged destruction of Plaintiffs' video and audio recordings hindered Plaintiffs' business, but the destruction itself is not directly tied to one of the identified racketeering acts.

For the above-stated reasons, the court concludes that Plaintiffs' RICO claim lacks merit. RICO was enacted because Congress found that " 'organized crime in the United States [had become] a highly sophisticated, diversified, and widespread activity that annually drain[ed] billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption." ' *Beck v. Prupis*, 529 U.S. 494, 496, 120 S.Ct. 1608, 146 L.Ed.2d 561 (citation omitted). The court declines to extend its reach to the instant case.

### D. Municipal Liability— Counts XV–XVII

Counts XV and XVI are claims for monetary and injunctive relief from the City of Lawrence for its allegedly unconstitutional practices or customs. Count XVII is against Chief Olin for failure to adequately train his officers. Defendants respond simply: because Plaintiffs have failed to show that they exercised any First Amendment rights, their claims against Chief Olin and the municipality must be dismissed as a matter of law. The court agrees.

In sum, the court determines that Defendants' motion is granted. The court need not consider Plaintiffs' motions, and they are denied as moot.

IT IS, THEREFORE, BY THE COURT ORDERED that Defendants' motion to dismiss or for summary judgment (Doc. 121) is granted.

IT IS FURTHER ORDERED that Defendants' motion to supplement Doc. 121, to add a page erroneously omitted, (Doc. 140) is granted.

IT IS FURTHER ORDERED that Plaintiffs' motions for summary judgment (Docs. 18 and 20) and motion to treat summary judgment motion as uncontested (Doc. 149) are denied as moot.

Copies or notice of this order shall be transmitted to counsel of record and *pro se* Plaintiffs.

The case is closed.

**IT IS SO ORDERED.**